IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Case No. 2:24-cv-1269 |
| **Plaintiff,** | : | |
| v. | : | |
| **THIRTY-ONE THOUSAND FOUR HUNDRED FORTY AND 00/100 DOLLARS ($31,440.00) IN UNITED STATES CURRENCY,** | : | **VERIFIED COMPLAINT FOR FORFEITURE IN REM** |
| **Defendant 1,** | : | |
| and | : | |
| **TWO THOUSAND SIX HUNDRED THIRTEEN AND 00/100 DOLLARS ($2,613.00) IN UNITED STATES CURRENCY,** | : | |
| **Defendant 2.** | : | |

Plaintiff, United States of America, by its undersigned counsel, alleges the following for its action against the defendants in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure.

**NATURE OF THE ACTION**

1. This is a civil action *in rem* brought to enforce 21 U.S.C. § 881(a)(6), which provides for the forfeiture to the United States of:

> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

## THE DEFENDANTS IN REM

2. The defendants are a total of $34,053.00 in United States Currency, and more particularly described as:

a. Defendant 1 is Thirty-One Thousand Four Hundred Forty And 00/100 Dollars ($31,440.00) In United States Currency. The Drug Enforcement Administration ("DEA") seized Defendant 1 on or about September 27, 2023, from Douglas Cook, Jr.'s checked luggage, following a consensual encounter with him at the John Glenn Columbus International Airport. Defendant 1 has been deposited into the Seized Asset Deposit Fund, where it will remain during the pendency of this action.

b. Defendant 2 is Two Thousand Six Hundred Thirteen And 00/100 Dollars ($2,613.00) In United States Currency. The DEA seized Defendant 2 on or about September 27, 2023, from Douglas Cook, Jr.'s pockets, following a consensual encounter with him at the John Glenn Columbus International Airport. Defendant 2 has been deposited into the Seized Asset Deposit Fund, where it will remain during the pendency of this action.

## JURISDICTION AND VENUE

3. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendants under 21 U.S.C. § 881(a)(6). This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345 and over an action for forfeiture under 28 U.S.C. § 1355(a).

4. This Court has *in rem* jurisdiction over the defendants under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of Ohio.

5. Venue is proper in this district under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of Ohio and under 28 U.S.C. § 1395 because the defendants were found in the Southern District of Ohio.

## BASIS FOR FORFEITURE

6. The defendants are subject to forfeiture under 21 U.S.C. § 881(a)(6) because they represent property furnished or intended to be furnished in exchange for a controlled substance, represent proceeds traceable to such an exchange, or were used or intended to be used to facilitate any violation of 21 U.S.C. § 841 or a conspiracy to commit such offense, in violation of 21 U.S.C. § 846.

## FACTS

7. On or about September 27, 2023, members of the Columbus, Ohio Airport DEA Group at the John Glenn Columbus International Airport ("CMH") received information regarding the suspicious travel of an airline passenger identified as Douglas Cook, Jr. ("Cook").

    a. Members of the Columbus, Ohio Airport DEA Group are trained and experienced and know that persons engaged in the commercial interstate distribution of controlled substances frequently use CMH and the aircraft that arrive and depart there to transport drug sales proceeds and funds to be used to purchase drugs in and out of Columbus. Those proceeds and funds are usually in the form of United States Currency.

    b. Members of the Columbus, Ohio Airport DEA Group are trained and experienced and know that persons engaged in the commercial interstate distribution of controlled substances frequently use couriers to transport controlled substances, drug sales proceeds, and funds to be used to purchase drugs in and out of Columbus. CMH and the aircraft that arrive and depart there are relied upon as a means of sending and receiving

3

such couriers.

      c.     Members of the Columbus, Ohio Airport DEA Group are trained and experienced in investigating illegal drug and drug currency couriers, and they have learned to observe and detect the behavior, characteristics, and other travel indicators which help them to distinguish suspected illegal drug and drug currency couriers from the normal, non-criminal traveling public.

      d.     Members of the Columbus, Ohio Airport DEA Group are trained and experienced and know that illegal drug and drug currency couriers often purchase airline tickets within 72 hours of travel to a known source area for illegal drugs like Las Vegas, Nevada, or to a known destination area for illegal drugs like Columbus, Ohio.

      e.     DEA Task Force Officer Eric Doyle ("TFO Doyle"), DEA Task Force Officer Andrew D'Orazio ("TFO D'Orazio"), and DEA Task Force Officer Raul Melo ("TFO Melo") are members of the Columbus, Ohio Airport DEA Group.

8.     The investigators learned that on September 26, 2023, a one-way ticket was purchased for Cook to fly from Columbus, Ohio to Las Vegas, Nevada the next day — September 27, 2023 — via Spirit Airlines Flight 205.

9.     After receiving information about Cook's ticket purchase, investigators learned that Cook's criminal history includes illegal narcotics activity. After reviewing this information, the investigators decided to speak to Cook about his travel.

10.     At approximately 3:15 p.m. on September 27, 2023, investigators observed as Cook exited the CMH Transportation Security Administration's ("TSA") Checkpoint for CMH's Concourse B.

4

11. Investigators noted that Cook's flight was set to begin boarding at approximately 3:10 p.m.

12. After Cook cleared the TSA Checkpoint, TFO D'Orazio and TFO Melo approached Cook in a way as not to block his freedom of movement. The investigators were in plain clothes with no weapons or badges displayed.

13. The investigators noted that Cook was carrying a cellular telephone in his hand and was not carrying any luggage or bags with him. He was wearing a t-shirt and sweatpants-style pants.

14. The investigators identified themselves as law enforcement officers and asked Cook if he would speak with the officers. Cook agreed to speak to the investigators.

15. TFO D'Orazio asked Cook for the reason for his travel and why he had purchased a ticket the day before his flight. Cook replied that he was going to "Las Vegas" to visit family but did not provide names of anyone he was going to see. Cook did not explain the late ticket purchase.

16. As Cook was not carrying any bags with him, TFO D'Orazio asked Cook if he had checked any luggage for his flight. Cook advised he did not.

17. Shortly thereafter, TFO Doyle notified the investigators that he had located a bag in the CMH's baggage area which Cook had checked for his flight.

18. After learning this, TFO D'Orazio asked Cook a second time if he had checked any bags with the airline ticket counter. Cook again advised that he did not have any checked baggage. TFO D'Orazio asked Cook if he was sure. Cook advised that he was.

19. As Cook did not have any bags or luggage with him and was denying that he had checked any bags, TFO D'Orazio asked Cook how long he was staying in Las Vegas and why he

didn't have any extra clothing with him. Cook said that he was staying with family and that he would be there for one week.

20. Cook later said that he would be shopping for clothing while in Las Vegas.

21. TFO Melo asked Cook what he planned to do about toiletries — a toothbrush, deodorant, other personal hygiene items. Cook did not answer TFO Melo's question.

22. At this time, TFO D'Orazio asked Cook again if he had checked a bag for the flight. TFO D'Orazio asked Cook to tell the truth and advised him that there was a reason he was asking Cook the same question again. Cook still denied checking a bag. After hearing this, TFO D'Orazio advised Cook that he had already been notified that Cook had checked a bag and that TFO Doyle had located it. Finally, Cook confirmed to the investigators that he did check a bag at the ticket counter.

23. When asked why he had lied about checking a bag, Cook did not respond to the question.

24. While speaking to Cook, the investigators noticed that Cook appeared to be very nervous. TFO D'Orazio confirmed to Cook that everything was "okay" and encouraged him to take a few deep breaths to try to calm his nerves.

25. TFO D'Orazio then asked Cook if he was carrying any illegal narcotics. Cook stated that he was not. TFO D'Orazio then asked if he was carrying any large amounts of United States Currency. Cook stated that he did not have anything like that.

26. At this point, TFO D'Orazio asked Cook if his partner, TFO Doyle, could search his checked bag. Cook consented to TFO Doyle searching his checked bag.

6

27. Upon searching Cook's checked bag, TFO Doyle notified the investigators that he found a cellular telephone and a large amount of United States Currency layered or secreted inside multiple pairs of pants held in the checked bag.

28. After learning about the currency found in the checked bag, TFO D'Orazio advised Cook that United States Currency had been found in his checked bag and asked Cook how much money he was traveling with. Cook stated about $20,000.00.

29. TFO Doyle advised investigators that based upon his training and experience, he estimated that there was more than $20,000.00 in the checked bag.

30. After learning about the money in Cook's checked bag, TFO D'Orazio asked Cook if he would empty his pockets. Cook agreed and produced more United States Currency and two cellular telephones from the pockets of his sweatpants. When asked, Cook estimated that he was carrying about $2,500.00 in his pants pockets.

31. Upon seeing that Cook was carrying a large amount of currency in addition to what was found in his checked bag, TFO D'Orazio asked Cook why he was traveling with such a large amount of currency. Cook stated that he had earned the money he was carrying from playing video games but did not explain why he was traveling with the currency.

32. TFO D'Orazio asked Cook again why he was taking the currency to Las Vegas. Cook did not respond to the question.

33. TFO D'Orazio then asked Cook where he had gotten the actual bills in his possession from. Cook advised he had withdrawn the currency from the bank.

34. When asked to provide proof of bank withdrawals; if he could show a receipt or log on his online banking system to show the withdrawal, Cook responded that he could not provide either.

7

35. TFO D'Orazio asked Cook how much money he had made in the last year. Cook stated that he did not know and that he could not provide the investigators with an estimate.

36. Cook also told the investigators that he doesn't pay taxes.

37. Finally, TFO D'Orazio asked Cook if any pictures or videos of illegal narcotics were on any of his cellular telephones and if Cook would allow the investigators to look at messages and pictures on the cellular telephones in Cook's presence for any illegal activity. Cook said no.

38. Based on this investigation and TFO D'Orazio's training and experience, the investigators suspected that Cook was involved in illegal narcotics activity and that the currency in his checked bag and pockets was related to this illegal activity.

39. TFO D'Orazio advised Cook that the United States Currency located in his checked bag and pockets was being administratively seized as drug proceeds. The investigators also advised Cook that his cellular telephones would be seized for further investigation. The investigators took custody of the currency and cellular telephones and provided Cook with a custody receipt form for the property.

40. Cook did not board his flight.

41. Following their consensual encounter with Cook, the investigators returned to the DEA's airport office and requested assistance from Columbus Regional Airport Authority Police K-9 Officer Dale Beam ("Officer Beam") and K-9 "TRex," who are trained and certified in the State of Ohio, to conduct narcotic detection K-9 sniffs at the DEA's airport office on boxes that contained the currency seized from Cook's backpack and wallet.

42. The seized currency was placed in new United States Postal Service Priority Mail medium flat rate boxes ("USPS box") and sealed. The narcotic detection K-9 sniff consisted of four separate K-9 sniffs as follows.

    a. Ten USPS medium flat rate boxes were placed in a circle in the DEA office. Three of the USPS boxes were empty, and seven contained shredded, circulated and un-circulated currency. Officer Beam and K-9 TRex entered the area, and Officer Beam gave K-9 TRex the command to search. K-9 TRex did not show a change in behavior in the room or on the ten USPS boxes. Officer Beam and K-9 TRex then left the area.

    b. The DEA officers replaced one of the USPS boxes with one of the USPS boxes that contained money seized from Cook. The location of the money was unknown to Officer Beam. Officer Beam and K-9 TRex returned to the area, and Officer Beam gave K-9 TRex the command to search. While searching, K-9 TRex showed a change of behavior on one of the USPS boxes, that is, his breathing quickened, and he stopped quickly at the USPS box. K-9 TRex then placed his front paws on top of the USPS box and began to scratch the USPS box, indicating a positive alert for the odor of narcotics on the USPS box. The DEA officers advised Officer Beam that it was the USPS box containing money seized from Cook.

    c. After the first alert, the original ten USPS medium flat rate boxes were again placed in a circle in the DEA office. As before, three of the USPS boxes were empty, and seven contained shredded, circulated and un-circulated currency. Officer Beam and K-9 TRex entered the area, and Officer Beam gave K-9 TRex the command to search. K-9 TRex did not show a change in behavior in the room or on the ten USPS boxes. Officer Beam and K-9 TRex then left the area.

    d.  The DEA officers again entered the area and replaced one of the USPS boxes with the other USPS box that contained money seized from Cook. The location of the money was unknown to Officer Beam. Officer Beam and K-9 TRex returned to the area, and Officer Beam gave K-9 TRex the command to search. While searching, K-9 TRex showed a change of behavior on one of the USPS boxes, that is, as he moved around the packages his head snaped back quickly as he passed one package and his breathing quickened. K-9 TRex then placed his front paws on top of this USPS box and began to scratch the USPS box, indicating a positive alert for the odor of narcotics on the USPS box. The DEA officers advised Officer Beam that it was the USPS box containing money seized from Cook.

  43.  One of the K-9 sniffs described a positive K-9 alert for narcotics on the USPS box containing Defendant 1, $31,440.00 in United States Currency.

  44.  The other K-9 sniff described the positive K-9 alert for narcotics on the USPS box containing Defendant 2, $2,613.00 in United States Currency.

  45.  An official count of the United States Currency seized from Cook's checked bag revealed that it totaled $31,440.00 (Defendant 1):

| Denomination | Quantity | Total |
|---:|---:|---:|
| $100 | 203 | $20,300.00 |
| $50 | 164 | $8,200.00 |
| $20 | 147 | $2,940.00 |
| $10 | 0 | $0.00 |
| $5 | 0 | $0.00 |
| $1 | 0 | $0.00 |
| | | $31,440.00 |

46. An official count of the United States Currency seized from Cook's pockets revealed that it totaled $2,613.00 (Defendant 2):

| Denomination | Quantity | Total |
|---|---|---|
| $100 | 0 | $0.00 |
| $50 | 0 | $0.00 |
| $20 | 128 | $2,560.00 |
| $10 | 5 | $50.00 |
| $5 | 0 | $0.00 |
| $1 | 3 | $3.00 |
| | | $2,613.00 |

47. During the investigation in this case, investigators received information from the Ohio Department of Taxation which confirms that Cook did not file any personal or business State of Ohio tax returns claiming income in 2020 through 2022.

48. Finally, on or about October 12, 2023, investigators obtained a Search Warrant from Franklin County Municipal Court Judge Jarrod B. Skinner for the cellular telephones seized from Cook.

 a. During a review of the contents of one of the cellular telephones seized from Cook's pockets, investigators observed numerous images of cups and baggies containing large quantities of white powder and white crystalized or rock-like substances.

 b. Based on their training and experience, the investigators believe that the pictures show bulk quantities of illegal narcotics.

 c. In particular, one photograph, or screen shot, that investigators found on this cellular telephone seized from Cook's pocket, depicts a white brick that appears to be pressed white powder with "F1000" etched or pressed into it like a brand on the block.

 d. Based on information known to the investigators, at least one brick of a similar appearance, and bearing the same brand, has been seized by investigators in the United States and was found to contain fentanyl and cocaine HCL.

11

    e.  In addition, a photograph of a January 20, 2023, message to Cook by an email address believed to be the mother of his child, states that she intends to meet "with the drug force agency to tell them everything I know about your dealing self."

  49.  Based on the foregoing facts, the United States asserts that the defendants, $31,440.00 in United States Currency (Defendant 1) and $2,613.00 in United States Currency (Defendant 2), represent property furnished or intended to be furnished in exchange for a controlled substance, represent proceeds traceable to such an exchange, or were used or intended to be used to facilitate any violation of 21 U.S.C. § 841 or a conspiracy to commit such offense, in violation of 21 U.S.C. § 846. Therefore, the defendants are subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6).

  50.  On or about December 21, 2023, the DEA received a valid administrative claim from Cook as to the defendants. In his claim, Cook asserts that the seized currency represents proceeds from a real estate investment that he had previously made. In support of his claim, Cook provided a copy of a check dated May 1, 2023, in the amount of $30,000.00 made payable to him. No other information about the real estate investment or bank records or transactions associated with the check were provided. As of the filing of this Complaint, the DEA has been unable to confirm any real estate transactions lined to Cook in 2023.

<strong><u>CLAIM FOR RELIEF</u></strong>

  WHEREFORE, the plaintiff respectfully requests that:

  (a)  pursuant to Rule G(3)(b)(i), Supplemental Rules, the Clerk issue a warrant of arrest *in rem*, directing the United States to arrest and seize the defendants and to retain the same in its custody subject to further order of the Court;

  (b) the Court, pursuant to Rule G(4), Supplemental Rules, direct the United States to give notice to all persons and entities having an interest in the defendants to assert, in conformity with the law, a statement of any interest they may have, including notice by publication on the official government website, www.forfeiture.gov, for 30 consecutive days;

  (c) the forfeiture of the defendants to the United States be confirmed, enforced, and ordered by the Court;

  (d) the Court thereafter order the United States to dispose of the defendants as provided by law; and

  (e) the Court award the United States all other relief to which it is entitled, including the costs of this action.

        Respectfully submitted,

        KENNETH L. PARKER
        United States Attorney


        s/William B. King II
        WILLIAM B. KING II (0094046)
        Assistant United States Attorney
        Attorney for Plaintiff
        221 East Fourth Street, Suite 400
        Cincinnati, Ohio 45202
        (513) 684-3711
        Bill.King@usdoj.gov

## **VERIFICATION**

I, Eric M. Doyle, hereby verify and declare under the penalty of perjury that I am a Task Force Officer with the Drug Enforcement Administration, that I have read the foregoing Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the complaint are true to my own knowledge, except those matters stated to be alleged on information and belief and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, and my investigation of this case.

I hereby verify and declare under the penalty of perjury that the foregoing is true and correct.

_3/18/24_
Date

_____
ERIC M. DOYLE, Task Force Officer
Drug Enforcement Administration

14